UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, ex rel                    Case No. 08-
CASSIE BASS and STATE OF MICHIGAN,
ex rel, CASSIE BASS,                                Hon.

       Plaintiff-Relator,                          **MATTER FILED IN CAMERA
                                                   AND UNDER SEAL**

v

WALGREEN CO., d/b/a WALGREENS
PHARMACY, a foreign corporation,

       Defendant.
_____/

HERTZ SCHRAM PC
By:    Patricia A. Stamler (P35905)
       Daniel W. Rucker (P67832)
Attorneys for Plaintiff-Relator
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302-0183
(248) 335-5000
_____/

**COMPLAINT FOR VIOLATION OF FALSE CLAIMS
ACT (QUI TAM), ANTI-KICKBACK STATUTE, CIVIL
MONETARY PENALTIES AND THE MEDICAID FALSE CLAIMS ACT
AND DEMAND FOR JURY TRIAL**

      Plaintiff-Relator, Cassie Bass, for themselves and on behalf of the United States of

America and the State of Michigan, by and through her attorneys, HERTZ SCHRAM PC, hereby

files this Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., the Anti-

kickback Statute, *see* 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7b(b), the Civil Monetary Penalties

Law, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, and the Michigan Medicaid False Claims Act,

MCL 400.601 *et seq.* ("Acts") and states as follows:

## JURISDICTION AND VENUE

1.      This action arises under 31 U.S.C. § 3729 *et seq.*, also known as the False Claims Act, MCLA 400.604 *et seq.*, also known as the Michigan Medicaid False Claims Act (the "Acts"), and the common law to recover treble damages and civil penalties on behalf of the United States of America and the State of Michigan arising out of the Defendant's submission of fraudulent claims to the United States and the State of Michigan Governments through the federal Medicare and the federal and state Medicaid program.

2.      31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal False Claims Act and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under such Act.  In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.  Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) or any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the Act which provides that "any action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred."  The acts which are the subject of this action, occurred in Southeast Michigan, including but not limited to Detroit and Highland Park, in the State of Michigan, within this judicial district.

4.      Under the False Claim Act, this complaint is to be filed in-camera and remain under seal for a period of at least sixty (60) days and under the Medicaid False Claims Act the complaint is to be filed in-camera and remain under seal for a period of at least ninety (90) days and shall not be served on defendants until the Court so orders.  The federal government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and the state government may elect to intervene and proceed with the action within ninety (90) days after it receives both the Complaint and the material evidence.

5.      As required under § 3730(a)(2) of the federal Act, Relator has provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Michigan, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint (the "Disclosure Statements").  Relator has also provided the Attorney General of the State of Michigan a copy of the Evidentiary Disclosure.

6.      Relator is the original source of the information of the allegations contained in this Complaint.

7.      This is also an action to recover damages, civil penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7b(b), which provisions are commonly known as the Anti-kickback Statute.

8.      This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL").

## PARTIES

9.      Relator Cassie Bass is a citizen and resident of the State of Michigan, United States of America, and brings this action on behalf of the United States of America and the State of Michigan.

10.     Defendant Walgreen Co., d/b/a Walgreens Pharmacy (hereafter "Walgreens"), is a foreign corporation and is for all times relevant to this Complaint an Illinois corporation doing business throughout the United States including well more than 100 business locations in the State of Michigan of which approximately 95 business locations are situated in southeast Michigan.

## GENERAL ALLEGATIONS

11.     Defendant "Walgreens" was founded in 1901 and grew to a chain of 6,000 stores by fall 2007.

12.     Walgreens is a nationwide chain with stores ranging from Illinois to Puerto Rico, Virginia, Louisiana, Missouri, California, Hawaii, and elsewhere.

13.     There are approximately 95 Walgreens stores in the metropolitan Detroit, Michigan area and more than 75 additional stores located across the lower Michigan and its Upper Peninsula.

14.     Providers of pharmacy services compete for the opportunity to fill customers' prescriptions.  In order to obtain a competitive advantage in obtaining customers' business, a number of pharmacies have relied upon specific incentives like gift cards and other discounts to encourage customers to transfer their business.

4

15. Pharmacies that provide discounts as incentives for customers to transfer pharmacies leads to customers "pharmacy hopping" with the goal that the pharmacy providing the discount will retain the customers' future business.

16. Walgreens engaged in providing customers discounts through such means as a Prescription Savings Discount Club, $10 discount checks, $20 discount checks, $25 gift card coupons, and $50 coupon brochures.

17. Walgreens understood that providing discounts to Medicare, Medicaid, and TRI-CARE recipients initiated federal reporting requirements.

18. Defendant Walgreens properly noted these Medicare and Medicaid recipients were excluded from access to some discounts, such as the Discount Club above.

19. Despite Defendant Walgreens' knowledge of mandatory reporting requirements with regard to federally funded prescription drug coverage, Walgreens gave discounts on prescription drugs that it provided to Medicare and Medicaid recipients through discount checks, gift cards and other coupons.

20. Defendant Walgreens also failed to disclose to Medicare or Medicaid recipients any requirement on the recipients' part to report such discounts to the federal government.

21. Defendant allowed Medicare and Medicaid recipients to benefit from discounts at the expense of Medicare and Medicaid.

22. Defendant's management instructed their employees, including Relator herein, to disregard the prohibition against Medicare and Medicaid recipients use of its discount coupons.

23.     In addition Defendant distributed certain discount coupons that on their faces did not restrict Medicare and Medicaid recipients from gaining the benefit of a coupon or gift card at the expense of Medicare and Medicaid.

24.     Defendant's prescription drug discounts, on their face and/or in practice, remunerated Medicare and Medicaid recipients as an inducement for purchasing prescriptions drugs, without passing that remuneration on to Medicare and Medicaid.

25.     The remuneration also acted as an incentive for the beneficiaries of the federal health care programs to purchase their prescription drugs from Defendant in particular.

26.     Defendant concomitantly contravened the False Claims Act, 31 U.S.C. § 3729, by certifying, or impliedly certifying, that it was in compliance with Medicare laws, Medicaid laws, the Anti-kickback Statute, and the CMPL; and violated the MFCA by certifying it was in compliance with Medicaid laws, thereby causing the federal and state governments to pay false claims that they otherwise would not have paid.

27.     Relator commenced her employment with Defendant Walgreens on February 12, 2004, initially as a cashier for its 15516 Grand River Avenue, Detroit, Michigan location.

28.     In June 2005, Relator was elevated to the position of Pharmacy Technician, a position that she currently maintains at Defendant Walgreens.

29.     Relator's duties as a Pharmacy Technician include the intake of prescription orders; filling prescriptions; transferring prescriptions from other pharmacies, such as Rite Aid, CVS, Wal-Mart, and independent pharmacies; documenting customer files regarding prescriptions; and meeting and greeting customers.

30.     The pharmacists at Defendant verify the accuracy of prescriptions filled by Relator and other pharmacy techs.

31.     The pharmacists at Defendant also counsel customers about the appropriate uses of their prescriptions.

32.     Defendant maintains its pharmacy records for at least five years.

33.     During her employment with Defendant, Relator received a two-week course of pharmacy lectures.

I.     **FRAUDULENT CONDUCT IN VIOLATION OF THE ANTI-KICKBACK STATUTE AND THE CIVIL MONETARY PENALTIES LAW**

34.     The fraudulent conduct, in contravention of the provisions of the Anti-kickback Statute and the CMPL, arises from the provision of improper remuneration to Medicare and Medicaid recipients in the form of Defendant's discount checks, discount coupons, and discount cards.

35.     Defendant used the remuneration to induce recipients of federal health care benefits to purchase prescriptions in order to obtain additional goods at the expense of Medicare, Medicaid.

36.     Defendant also used the remuneration as an incentive for recipients of federal health care benefits to purchase prescriptions from Defendant in particular.

37.     Some of the Defendant's discount coupons included disclaimers constraining Medicare and Medicaid recipients from benefitting from the discounts, however, other Walgreens' discount coupons contained no restrictions on use by Medicare or Medicaid recipients.

38.     The disclaimers on Defendant's discount coupons failed and continue to fail to meet federally mandated requirements.

39.     Defendant systematically ignored the constraints written on its discount coupons.

40.     Defendant's brochures attached to certain coupons and its management practices demonstrate that all customers, including Medicare and Medicaid recipients, were to benefit from these discount coupons.

41.     Walgreens' "disclaimers" only partially restricted Medicare and Medicaid recipients' use of the discount coupons to purchase prescription drugs.

42.     Defendant used the discount coupons as incentives to attract the business of Medicare and Medicaid recipients.

43.     Walgreens did not report the discounts to the federal government or inform the recipients of any duty to report the discounts to the federal government.

44.     Walgreens did not monitor and failed to create a monitoring process to ensure that the discount coupons were not used by recipients of federal health care benefits.

45.     In failing to take the appropriate steps to pass the discount on to Medicare and Medicaid, and in using the discounts as incentives for recipients to obtain services from Walgreens in particular, Defendant violated the Anti-kickback Statute, the CMPL, the False Claims Act and the MFCA.

46.     Defendant specifically implemented the following discount programs:

A.      **Walgreens' $10 Coupon Check**, which were valid at least at Defendant's Store No. 06708.

        i.      Based on Relator's observations, Walgreens permitted Medicare
                and Medicaid recipients to use the $10 Coupon Check to purchase

prescription drugs without reporting the discount to Medicare or Medicaid.

B.    **Walgreens' $20 Coupon Check and Brochure**, which were valid at least at Defendant's Store Nos. 06708, 05226, and 04749.

    i.        The brochure attached to the $20 checks describes, in part:

> **Free Help Finding Prescription Discounts**
>
> Whether you ***need help finding the Medicare Prescription Insurance plan that's right for you, or you're not sure you qualify for another drug discount program***, talk to your Walgreens pharmacist.  They'll give you a free report that will tell you which plans cover the most of your current medications.
> (emphasis added).

    ii.       Walgreens intended that Medicare recipients receive the brochure and that Walgreens intended to provide "Prescription Discounts" to Medicare recipients.

    iii.      The brochure characterizes "Medicare Prescription Insurance" as a drug discount program by encouraging the reader to ask a pharmacist whether the reader qualifies "for another drug discount program" other than Medicare.

    iv.      The brochure also states:

> **Fast, Easy and FREE Prescription Transfers**
> **To take advantage of many great services, start filling your prescriptions at Walgreens today!**
> Transferring your prescription to Walgreens is easy – all we need is the information on your prescription bottle.  Just call or stop in, and we'll do the rest.
>
> **Transfer a Prescription Today & Save $20!**
> Here's How:
> **1.** Transfer and fill a prescription from any other pharmacy.
> **2.** Present the attached check to our pharmacy staff.
> **3.** Save $20 on your next non-prescription purchase.
>                                   *See check for details.*

v.      This passage states that Walgreens intends to supply a discount to any customers transferring prescriptions from another pharmacy.

vi.     The brochure specifically encourages Medicare and Medicaid recipients to take advantage of Walgreens' discount programs and then offers all customers a $20 check coupon for transferring their prescriptions.

vii.    Thus, the brochure proclaims in bold, large-font, red and green lettering that Walgreens can provide discounts to Medicare and Medicaid recipients and that any customer transferring a prescription is entitled to a $20 check coupon.

viii.   The brochure is designed as an incentive to attract customers to transfer prescriptions to Walgreens and the brochure specifically refers to the benefits that Medicare recipients can receive under the heading of "Prescription Discounts."

ix.     Only in a small disclaimer on the check coupon does Walgreens state that the check is not valid with Medicaid or Medicare.

x.      The checks were distributed without regard to the recipient's status as a recipient of federal benefits.

xi.     Walgreens indiscriminately mailed these $20 check coupons to approximately 6.1 million members of the American Association of Retired Persons ("AARP").  Many of whom are Medicaid and Medicare recipients.

xii.    Relator was instructed to, and observed others, disregard the disclaimers on the $20 check coupons and supply the $20 benefit to Medicare and/or Medicaid recipients, without reporting the discounts to Medicaid or Medicare.

xiii.   Walgreens also failed to include any notice on the face of the brochure or check which would indicate to the Medicaid or Medicare recipients the need to report the $20 discount to the federal government.

xiv.    The check coupon does not restrict a patron from using the check to purchase prescription drugs as long as the customer does not use the check for a co-pay.  Thus, a Medicaid or Medicare recipient was allowed to use the check to purchase a prescription in full and

10

then bill the cost back to Medicaid or Medicare in contravention of the law.

xv.  Relator observed that Walgreens did not monitor and report the transactions involving the $20 discount check to ensure that Medicaid or Medicare recipients were not using the check coupons for cash purchases of prescriptions.

xvi.  Defendant used $20 check coupons that, on their face and in practice, remunerated Medicare and Medicaid recipients as an inducement for purchasing prescriptions drugs and without passing that remuneration on to Medicare and Medicaid.

xvii.  Defendant's corporate headquarters "Store Operations" division notified its managers, including management for the stores in District 160, that the $20 check coupons above would be altered to provide a $25 benefit for transferred prescriptions.  The increased benefit commenced on November 1, 2007.

C.  **Walgreens' $25 "Gift Card Coupon**" and the gift card advertisement

which does ***not*** limit the card to use at a particular Walgreens store.

i.  The gift card advertisement tells customers that they will

***Receive a FREE $25 Walgreens Gift Card when you purchase a transferred prescription*** (except from another Walgreens). ***Card can be used toward any purchase in the store except mandatory insurance co-pays***, liquor, tobacco and dairy as restricted. If the purchase is less than the card value, the balance will remain on your card to use later, no change will be given.  See back of card for more details. Coupon must accompany purchase. Limit one Gift Card coupon offer per customer. ***Not valid with Medicaid, Medicare or any other governmental programs or where prohibited by law***.  Cannot be combined with any other prescription offer. Coupon expires 11/25/07.

ii.  This gift card advertisement is included on the same page as coupons for DayQuil, NyQuil, and Claritin allergy medication.

iii.  Relator observed that Walgreens permitted Medicare and/or Medicaid recipients to use the gift card coupons to purchase prescriptions despite the disclaimer language prohibiting such use.

11

iv.     Walgreens distributed these types of gift cards, including gift cards disseminated on February 15, 2008, throughout the United States.

v.      Like the Defendant's check coupons detailed above, the gift card allows Medicaid and/or Medicare recipients to use the check to purchase prescriptions in full and then bill the cost back to Medicaid or Medicare in violation of the law.

vi.     The gift card constitutes remuneration in the form of a cash equivalent that only restricts Medicaid and Medicare recipients from using the gift card to make co-payments.

vii.    Medicare and Medicaid recipients were able to use the gift card to purchase a prescription in full without any notice on the face of the gift card or advertisement of any duty that he or she has to report the discount to Medicare or Medicaid.

viii.   Relator observed that Walgreens did not monitor and report such transactions to ensure that Medicaid or Medicare recipients were not using the gift cards for cash purchases of prescriptions.

ix.     Walgreens used $25 gift card coupons that, on their face and in practice, remunerated Medicare and Medicaid recipients as an inducement for purchasing prescription drugs without passing that remuneration on to Medicare and Medicaid.

D.      **Walgreens' $50 coupon brochure** for Medicare Part D recipients.

i.      In a November 29, 2007, E-mail from District Manager Donna Spencer to the Walgreens stores in District 160, Ms. Spencer referred to "the promotional materials [sic] for this new program."

ii.     The new program consisted of several coupons and brochures including a "$50 coupon brochure for Medicare Part D" with a Walgreens internal "order number" of "07PM0354."

iii.    This coupon brochure was specifically designed to target Medicare recipients, and, based on Relator's observations and the store's practices, Walgreens did not report these discounts to Medicare.

E.      **Front-of-Store-Prescription Transfer Promotion.**

i.      In a Walgreens' memorandum from Christopher Korwin, of Walgreens' Corporate Advertising, sent to Store Managers and

12

Pharmacy Managers, Mr. Korwin instructed personnel on the appropriate method of implementing Walgreens' "Front-of-Store Prescription Transfer Promotion 10/01/07 – 12/31/07."

ii.    The Korwin memo encourages pharmacists, while giving flu shots, to inquire whether the customer fills his or her prescriptions with Walgreens.

iii.   If the customer does not, the pharmacist is to present the customer with a brochure and say, "*We would like to reward you with a $20 store check if you give our pharmacy a try*." (emphasis added).

iv.    The memo states that "*[t]he 'promotional checks' are ONLY to be used for prescription transfers from a retail competitor*." (emphasis added).

v.     The Promotion explains the method for ringing up a customer with one of the promotional checks either at a pharmacy register or at the front register. The promotion says "*PROMOTIONAL CHECKS CANNOT BE USED FOR CO-PAY.*" (emphasis added).

vi.    However, nothing in the promotion procedural guidelines addresses any prohibition against Medicare or Medicaid recipients' use of the promotional checks.

vii.   Walgreens' corporate leadership instructed pharmacists and Store Managers to "reward" all customers obtaining flu shots with the $20 check coupons to transfer prescriptions to its pharmacy.

47.    Defendant's corporate policy was to disseminate the above-referenced check coupons, gift cards, and brochures to all customers regardless of their participation in Medicare or Medicaid. The $50 brochures specifically targeted Medicare recipients. The literature accompanying these various discount coupons encouraged Medicare and Medicaid recipients to participate in these discount programs.

48.     Defendant's practices were to ignore any disclaimers on the coupons, gift cards, or brochures and to affirmatively offer and supply the benefits to Medicare and/or Medicaid recipients without reporting the discounts to Medicaid or Medicare.

49.     The disclaimers and literature related to the Defendant's discount coupons detailed above did not prevent federal benefits recipients or other customers from using the coupons to pay the full cost of a prescription.

50.     Defendant's practices made it possible for Medicare and Medicaid recipients to make cash purchases of prescriptions with its coupons and to also wrongly seek reimbursement from Medicare and Medicaid.

51.     Based on Relator's observations and based on Defendant's practices, Defendant did not monitor such transactions; Defendant did not report such transactions to the federal authorities; and Defendant did not notify customers on the face of the discount coupons of their need to report the discounts to Medicare or Medicaid.

52.     Defendant's Product Development Manager, Jay Bernstein, revealed the company's position on marketing discounts to Medicare and Medicaid recipients in an E-mail dated November 30, 2007.

53.     In response to questions posed by Walgreens' Store Managers and a District Manager, Bernstein instructed the Walgreens' District Manager not to allow Medicare recipients to participate in the Prescription Savings Club.

54.     Bernstein admitted that Defendant had no ability to monitor whether Medicare and Medicaid recipients were purchasing covered prescriptions at a discount, and these would improperly go unreported to Medicare and Medicaid.

55.   Bernstein went on to write that

> We realize that this is a great sales opportunity for the stores to offer these patients an option, but the penalties for violating Medicare rules are quite strict. We're having discussions here with legal to determine how we can accommodate Medicare patients and I'm hopeful we'll be able to come up with something that we can build to solve this.  And of course, we'll communicate that with you at store level.

56.   Defendant's disclaimers were in very small print on the face of some of the coupons and other coupons lacked disclaimers altogether.

57.   Defendant affirmatively instructed its employees to distribute the coupons and gift cards without regard to its customers' participation in Medicare and Medicaid.

58.   Defendant failed to instruct its employees and pharmacists in particular, to ensure that such coupons were not used by Medicare and Medicaid recipients.

59.   Defendant further failed to monitor the customers' use of the coupons in cash transactions and admitted that it had no ability to carry out such monitoring.

60.   Defendant's coupons and gift card systems were designed to optimize sales and, as demonstrated by the partial list of participating Medicare and Medicaid recipients below, resulted in Medicare and Medicaid recipients obtaining Walgreens' discounts without proper reporting by Walgreens or notice to their customers of their need to report the discounts to the federal government.

## II.   WALGREENS PROVIDED DISCOUNTS TO MEDICARE AND/OR MEDICAID RECIPIENTS WITHOUT REPORTING THOSE DISCOUNTS OR NOTIFYING RECIPIENTS OF ANY NEED TO REPORT.

61.   Relator observed that approximately 90% of the customers using the check coupons or other promotional discounts/incentives listed above were Medicare, Medicaid, and/or

TRI-CARE recipients and about 10% of the customers using the promotions had private insurance.

62.     Between 8 a.m. and 10 p.m., the pharmacy where Relator works filled about 200-220 prescriptions each weekday, and filled prescriptions exceeding these figures on weekends.

63.     In July 2007, Tanisha Witherspoon was the Store Manager at Walgreens' Grand River Avenue, Detroit, Michigan location.

64.     Ms. Witherspoon distributed $20 check coupons to the staff, including Relator, to provide to customers who transferred their prescriptions to Defendant.

65.     The Relator raised concerns with the Pharmacy Manager, Sai Verma, that the Defendant's coupons were prohibited for use by recipients of federal healthcare benefits.

66.     Relator observed that the Pharmacy Manager and the pharmacists at Defendant knew it was illegal to provide the discounted rates to recipients of federal healthcare benefits but provided these discount coupons to these customers anyway.

67.     Mr. Verma told Relator that the corporate office of Defendant said to disseminate the coupons to the recipients of federal healthcare benefits.

68.     Relator observed that no employee of Defendant monitored the customers' use of the check coupons to determine whether they were used in Medicare or Medicaid transactions.

69.     Relator observed that the wholesale acceptance of coupons from Medicare and Medicaid recipients appeared to be in place throughout the Defendant's system, which spans the United States.

70.     In Michigan, the Relator observed that Defendant mailed out coupon checks to potential customers.  While, the coupons contained expiration dates, Defendant accepted the coupons beyond the expiration dates.

71.     Based on the observations of Relator, and her knowledge of the Walgreens' computer and document filing system, the presence of a "Pay Code: 0" indicates that the customer was a recipient of Medicare or Medicaid or another federal or joint state-federal health care program, and the presence of the language "Rx transferred from competitor" indicates that the customer received the benefit of one of the discounts described above.

72.     Relator observed many customers that were Medicare or Medicaid recipients who obtained the benefit of some of the discounts detailed above, including the following:

A.      On August 6, 2007, "M.H." obtained a prescription for 28 tablets of Aviane or Alesse and written by Terry Podolsky, DO.  The Walgreens' intake form is entitled "Transferred RX," and it lists "Macomb Pharmacy," with a phone number of (586) 979-9020, as the competing pharmacy.  On the reverse side of the printout is the label for a previous prescription at Macomb Pharmacy.  The form lists "RPh: EG" as the initials of the registered pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens computer system states "Pay Code: 0" and "Rx transferred from competitor: Macomb Pharmacy; (586) 9799020."  The printout lists "Rph Inits: EG" as the registered pharmacist, as well as "Terry Podolsky, DO" as the prescriber of the medication.

B.      On August 6, 2007, "S. B." obtained a prescription for 20mg tablets of Furosemide or Lasix and written by Caesar Austin, MD.  The Walgreens' intake form is entitled "Transferred RX," and it lists "Pickens Medical Pharmacy," with a phone number of (313) 544-

7144, as the competing pharmacy.  The form lists "RPh: JG" as the initials of the registered pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: Pickens Medical Pharmacy; (313) 5447144."   The printout lists "Rph Inits: JG" as the registered pharmacist, as well as "Caesar Austin, MD" as the prescriber of the medication.

        C.     On August 7, 2007, "R.P." obtained a prescription for 50mg tablets of Atenolol or Tenormin and written by L. Chenier, MD.  The Walgreens' intake form is entitled "Transferred RX," and it lists "Beene's," with a phone number of (318) 574-1351, as the competing pharmacy.  The form lists "RPh: LKM" as the initials of the registered pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: Beenes; (318) 5741351."   The printout lists "Rph Inits: LKM" as the registered pharmacist, as well as "L. Chenier, MD" as the prescriber of the medication.

        D.     On August 7, 2007, "M.S." obtained a prescription for 10mg tablets of Baclofen and written by Herbert C. Smitherman, MD.  The Walgreens' intake form is entitled "Transferred RX," and it lists "CVS/pharmacy," with a phone number of (313) 653-3427, as the competing pharmacy.  The form lists "RPh: TN" as the initials of the registered pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: CVS Pharmacy; (313) 6533427."   The printout lists "Rph Inits: TN" as the registered pharmacist, as well as "Herbert Smitherman, MD" as the prescriber of the medication.

E.      On August 8, 2007, "M.R." obtained a prescription for 400mg tablets of Ibuprofen or Motrin and written by Lynne Carter, MD.  The Walgreens' intake form is entitled "Transferred RX," and it lists "CVS/pharmacy," with a phone number of (313) 963-1007, as the competing pharmacy.  The form lists "RPh: LD" as the initials of the registered pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: CVS Pharmacy; (313) 9631007."  The printout lists "Rph Inits: LD" as the registered pharmacist, as well as "Lynne Carter, MD" as the prescriber of the medication.

F.      On August 9, 2007, "T.M." obtained a prescription for 37.5mg/HCTZ 25mg capsules of Triamterene or Dyazide and written by Dr. Sai Kannaganti.  The Walgreens' intake form is entitled "Transferred RX," and it lists "KAK*** **armacy," which is partially indecipherable, with a phone number of (313) 582-0100, as the competing pharmacy.  The form lists "RPh: JK" as the initials of the registered pharmacist accepting the transferred prescription. On the reverse side of the form is the label for the prescription which indicates "BNER SUC $0.00" and "Pay Code 0" and "MWEST."  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: Kakish Pharmacy; (313) 5820100."  The printout lists "Rph Inits: JK" as the registered pharmacist, as well as "Sai Kannaganti" as the prescriber of the medication.

G.      On August 13, 2007, "V.C." obtained a prescription for 800mg tablets of Ibuprofen or Motrin and written by Dr. Eric Kovan.  The Walgreens' intake form is entitled "Transferred RX," and it lists "Botsford Outpatient Pharmacy," with a phone number of (248) 471-8700, as the competing pharmacy.  The form lists "RPh: LT" as the initials of the registered

pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: Botsford Outpatient Pharm; (248) 4718700."  The printout lists "Rph Inits: LT" as the registered pharmacist, as well as "Eric Kovan" as the prescriber of the medication.

      H.      On August 13, 2007, "M.A." obtained a prescription for 20mg capsules of Omerprazole and written by Ravinder Khaira, MD.  The Walgreens' intake form is entitled "Transferred RX," and it lists "Henry Ford," with a phone number of (313) 653-2200, as the competing pharmacy.  The form lists "RPh: WS" as the initials of the registered pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: Henry Ford; (313) 6532200."  The printout lists "Rph Inits: WS" as the registered pharmacist, as well as "Ravinder Khaira, MD" as the prescriber of the medication.

      I.      On August 13, 2007, "E.B." obtained a prescription for 275mg tablets of Naproxen Sodium or Anaprox and written by Dr. Stacy Leatherwood.  The Walgreens' intake form is entitled "Transferred RX," and it lists "Henry Ford," with a phone number of (313) 916-9665, as the competing pharmacy.  The form lists "RPh: PB" as the initials of the registered pharmacist accepting the transferred prescription.  The corresponding patient printout from the Walgreens' computer system states "Pay Code: 0" and "Rx transferred from competitor: Henry Ford; (313) 9169665."  The printout lists "Rph Inits: PB" as the registered pharmacist, as well as "Stacy Leatherwood" as the prescriber of the medication.

      J.      On September 7, 2007, "L.G." obtained a prescription for 325mg tablets of Ferrous Sulfate and written by Dr. P. Reaves.  The Walgreens' prescription label says "BLH

RSL  $0.00" and "Pay Code 0" and "MIGL."  Immediately below the pay code, the label says "Rx transferred from Competitor: CVS Pharmacy; (313)8675293," and the label lists "Rph Ints: DD" as the registered pharmacist.  The label lists the prescribing doctor's name, address, and telephone number as "Dr. P. Reaves, 20176 Livernois Ave Suite 101, Detroit, MI 48221, PH (313) 927-0000."  The label also lists the Walgreens' pharmacy address as "15516 Grand River Ave, Detroit, MI 48227."

K.     On October 5, 2007, "S.C." obtained a prescription for 37.5mg/HCTZ 25mg capsules of Triamterene and written by M. Khan, MD.  The Walgreens' prescription label says "BNER  UER  $0.00" and "Pay Code 0" and "WELLCMPD."  Immediately below the pay code, the label says "Rx transferred from Competitor: CVS Pharmacy; (313)3830855," and the label lists "Rph Ints: GA" as the registered pharmacist.  The label lists the prescribing doctor's name, address, and telephone number as "M. Kahn, MD, 25880 W Outer Dr, Lincoln Park, MI 48146, PH (313) 389-5200."  The label also lists the Walgreens' pharmacy address as "15516 Grand River Ave, Detroit, MI 48227."

L.     On October 14, 2007, "M.P.K.", a Walgreens' pharmacist, obtained a prescription for 10mg tablets of Amlodipine Besylate or Norvasc and written by Dr. Felix Valbuena.  The patient printout from the Walgreens' computer system states "Pay Code: 0" but it does not note whether the prescription was transferred from a competing pharmacy.  On the reverse of the printout is one of the $20 check coupons describe in Part I, *supra*.  The $20 check coupon is payable to Walgreens store number 04749 and carries an expiration date of December 31, 2007.  The check coupon indicates that it is redeemable only at the Walgreens store located at 1765 Fort Street in Lincoln Park, Michigan.

73.     There are numerous recipients of federal and state health care benefits who received the benefit of the Walgreens' discount checks and coupons despite the presence or absence of any disclaimers on the face of such checks and coupons.

### III.  WALGREENS' POLICIES VIOLATE FEDERAL HEALTH CARE LAW AND MANDATE THAT WALGREENS PERSONNEL FOLLOW CORPORATE AND MANAGEMENT GUIDANCE ON ALL LEGAL QUESTIONS.

74.     Walgreens' managers and corporate officers mandates to its pharmacists and staff requiring that they provide discounts to Medicare and Medicaid recipients is particularly important in light of Walgreens' written policies.

75.     Walgreens' written policies indicate that it is committed to complying with Medicare and Medicaid laws and to submitting accurate bills to those programs.

76.     Walgreens' policies also mandate that all personnel defer to management and corporate guidance concerning the legality of any Walgreens' practices.

77.     Walgreens maintains a "Pharmacy Code of Conduct" ("Code") that it revised on April 12, 2007, and distributed to its employees.

78.     Under the heading "Scope," the Code states that it applies to all Walgreens employees.

79.     In the section entitled "Overview," the Code addresses Walgreens' emphasis on trust, integrity, and complying with all laws, policies and ethical codes.  In the "Walgreens' Compliance Commitment" section, the Code states that:

> *Walgreens is committed to compliance with all federal and state health care statutes, rules, regulations and guidelines, including all requirements of Medicare, Medicaid and other government health care programs.  Walgreens is committed to preparing and submitting accurate billings consistent with Medicare, Medicaid and other government sponsored health care program rules and regulations.*

22

(emphasis added.)

80.     Walgreens affirms to its employees that it is committed to complying with Medicare and Medicaid laws and the Code acknowledges Walgreens' knowledge of the governing Medicare and Medicaid laws.

81.     The Code also delineates specific "Required Actions" and "Prohibited Actions" and includes one of the Required Actions is to "promptly seek advice from the appropriate source(s) when questions concerning the application of pharmacy policies and/or laws arise."

82.     Employees are also directed by the "Required Actions" within the Code to "comply with all applicable federal and state laws and regulations, including Medicare, Medicaid and other government-sponsored healthcare programs."

83.     Under Walgreens' code, if a Walgreens employee is uncertain about the appropriate method of complying with federal health care law, he/she is "required" to seek advice from the "appropriate source(s)."

84.     The "appropriate source" is clarified in the Code under the headings "Where to Get Assistance" and "Where to Report Problems" and states that if an employee, such as Relator, "require[s] assistance in applying any of the principles contained in this Code of Conduct," the employee is instructed to "please contact your supervisor."

85.     If an employee observes violations of the Code, the Code refers the employee to contact his or her supervisors or corporate counsel for resolution.

86.     Walgreens' policy also requires its employees to refer questions of law to management and corporate leadership.

87.     The Code also sets forth a number of "Prohibited Actions" including that an employee may not "charge or accept payment higher or lower than the system-generated price without proper authorization"; "give inappropriate pricing discounts"; "knowingly bill a third-party plan for a false or nonexistent prescription or exceed authorized parameters of a prescription plan"; "violate Walgreens policies or state or federal laws related to pharmacy"; "enter into the system false or inaccurate information that may result in the erroneous billing of payers, including governmental payers."

88.     These prohibitions naturally require employees to rely upon and abide by company policy concerning discounts.

89.     In order to avoid accepting an unauthorized payment "higher or lower than the system-generated price," an employee must rely upon Walgreens' policies concerning when a higher or lower price is to be accepted.

90.     Walgreens disseminates check coupons, gift card coupons, coupon brochures, and employees must rely on Walgreens' authorization of the lowered price.

91.     In order to avoid giving "inappropriate pricing discounts," an employee must rely upon those discounts affirmatively sponsored by Walgreens, such as check coupons, gift card coupons, and coupon brochures.

92.     Despite Walgreens' code, employees were required to provide the various coupons to all customers, including Medicare and Medicaid recipients, at corporate headquarters.

93.     District Manager Spencer notified Walgreens' personnel that the $20 check coupons would be altered to $25 on November 1, 2007, but it does not limit which customers

24

could redeem the coupons and Walgreens' management affirmatively directed its employees to pursue Medicare recipients through a $50 coupon brochure.

94.     Walgreens' Product Development Manager, Jay Bernstein, communicated to employees that Walgreens recognizes the "great sales opportunity" represented by federal health care benefits recipients.

95.     Bernstein appropriately explained that such recipients could not participate in the Prescription Savings Club because of Walgreens' inability to monitor discounts and report those discounts to Medicare and Medicaid.

96.     Bernstein then stated "[w]e're having discussions here with legal to determine how we can accommodate Medicare recipients and I'm hopeful we'll be able to come up with something that we can build to solve this.  And of course, we'll communicate that with you at store level."

97.     The message presented to Walgreens' employees was that some discount programs were improper for Medicare and Medicaid recipients but Walgreens was tailoring discount programs that complied with Medicare and Medicaid.

98.     Walgreens did not instruct its employees that the check coupons, gift card coupons, and discount brochures represented unlawful remuneration to induce Medicare and Medicaid recipients to purchase prescriptions.

99.     Walgreens' corporate leadership affirmatively instructed its pharmacists to offer such promotional discounts to every customer who currently used a different pharmacy.  By way of example, pharmacists were expressly encouraged to ask "*each flu shot customer*" whether the

customer fills his or her prescriptions with Walgreens and, if not, to present the customer with a the $20 check coupon and brochure.

100.    Walgreens' guidelines from corporate leadership instructed employees to provide brochures to all potential transfer customers and said nothing about denying Medicare or Medicaid recipients the use of the promotional checks.

101.    Walgreens made it a corporate policy to disseminate the above noted check coupons, gift cards, and brochures to all customers regardless of their participation in Medicare or Medicaid.

102.    A Pharmacy Manager and Store Manager specifically conveyed to the Relator that Walgreens' corporate office intended all customers to receive the benefit of the coupons regardless of the customers' status as a Medicare or Medicaid recipient.

103.    Furthermore, Walgreens' written ethics policy pertaining to Anti-Kickback laws does not set forth the prohibition of remuneration in exchange for purchases made under a federal health care program.  The policy states,

> It is the Company's policy to comply with all laws that regulate the obtaining of prescription or other healthcare business.  Employees may not give or receive anything of value for their own benefit or for the benefit of the Company, including entertainment, or free or below cost services, in exchange for referring or receiving referrals of patients, goods or services.

Walgreens' ethics policy addresses the prohibitions contained in 42 U.S.C. § 1320a-7b(b)(2)(A), dealing with improper referrals.

104.    The ethics policy does not address the prohibitions in subpart (b)(2)(B), of the same section, which prevents anyone from providing remuneration to induce a person to

26

purchase any good for which payment may be made in whole or in part under a federal health care program. 42 U.S.C. § 1320a-7b(b)(2)(B).

105. Defendant's ethics policy also fails to deal with inappropriate incentives aimed at federal health care program beneficiaries. *See* 42 U.S.C. § 1320a-7a(a)(5).

106. Walgreens instituted a policy and practice of providing incentives to Medicare or Medicaid recipients and of failing to pass the discounts on to Medicare, Medicaid, and other federal and state health care programs.

## COUNT I
## FALSE CLAIMS ACT – CONSPIRACY

107. Relator incorporates by reference Paragraphs 1 though 106 of this Complaint.

108. Defendant, together with its employees and other persons or entities known or unknown, conspired to defraud the United States and the State of Michigan governments by agreeing to present false or fraudulent claims for payment or approval by the United States and the State of Michigan governments, which claims were false or fraudulent by virtue of Defendant's, and the co-conspirators', violation of the Anti-kickback Statute and the CMPL contrary to Defendant's simultaneous certification, or implied certification, to the United States government and the State of Michigan that Defendant was in compliance with the Medicare and Medicaid laws, the Anti-kickback Statute, the CMPL, and other federal and state health care laws. *See* 31 U.S.C. § 3729(a)(3).

109. The United States government and the State of Michigan were unaware of Defendant's improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT II
## FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS

110.    Relator incorporates by reference Paragraphs 1 though 109 of this Complaint.

111.    Defendant knowingly presented or caused to be presented to the United States and State of Michigan governments false or fraudulent claims for payment or approval, which claims were false or fraudulent by virtue of Defendant's violation of the Anti-kickback Statute and the CMPL contrary to Defendant's simultaneous certification, or implied certification, to the United States and State of Michigan governments that Defendant was in compliance with the Medicare and Medicaid laws, the Anti-kickback Statute, the CMPL, and other federal and state health care laws. *See* 31 U.S.C. § 3729(a)(1).

112.    The United States government and the State of Michigan were unaware of Defendant's improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT III
## FALSE CLAIMS ACT – FALSE RECORD OR STATEMENT

113.    Relator incorporates by reference Paragraphs 1 though 112 of this Complaint.

114.    Defendant knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States and State of Michigan governments, which claims were false or fraudulent by virtue of Defendant's violation of the Anti-kickback Statute and the CMPL contrary to Defendant's simultaneous certification, or implied certification, to the United States and State of Michigan governments that Defendant was in compliance with the Medicare and Medicaid laws, the Anti-kickback Statute, the CMPL, and other federal and state health care laws. *See* 31 U.S.C. § 3729(a)(2).

115.    The United States government and the State of Michigan were unaware of Defendant's improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

**COUNT IV**
**VIOLATIONS OF THE ANTI-KICKBACK STATUTE**
**AND THE CIVIL MONETARY PENALTIES LAW**

116.    Relator incorporates by reference Paragraphs 1 though 115 of this Complaint.

117.    The provisions of 42 U.S.C. § 1320a-7b(b)(1)-(3), commonly known as the Anti-kickback Statute, provide in relevant part as follows:

(b) Illegal remunerations

\* \* \* \* \*

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(3) Paragraphs (1) and (2) shall not apply to–

(A) a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program;

\* \* \* \* \*

(E) any payment practice specified by the Secretary in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987;

118.    The provisions of 42 U.S.C. § 1320a-7 provides for the exclusion of individuals and entities from participation in any Federal health care program, and states in relevant part as follows:

(b) Permissive exclusion

The Secretary may exclude the following individuals and entities from participation in any Federal health care program (as defined in section 1320a-7b(f) of this title):

* * * * *

(7) Fraud, kickbacks, and other prohibited activities

Any individual or entity that the Secretary determines has committed an act which is described in section 1320a-7a, 1320a-7b, or 1320a-8 of this title.

119.    In short, an individual or entity is subject to the penalties of the Anti-kickback Statute and to exclusion from participation in any Federal health care program when that individual or entity knowingly and willfully offers or pays any remuneration, which includes kickbacks, bribes, or rebates, either directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program. *See* 42 U.S.C. §§ 1320a-7b(b)(2)(b) and 1320a-7(b)(7).

120.    The provisions of 42 U.S.C. § 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL"), provide in relevant part as follows:

(a) Improperly filed claims

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that–

> (1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines–
>
> > \* \* \* \* \*
> >
> > (B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,
>
> \* \* \* \* \*
>
> (5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a-7(h) of this title) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this chapter, or a State health care program (as so defined);
>
> \* \* \* \* \*
>
> (7) commits an act described in paragraph (1) or (2) of section 1320a-7b(b) of this title;

shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; or in cases under paragraph (7), $50,000 for each such act). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages

of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose). In addition the Secretary may make a determination in the same proceeding to exclude the person from participation in the Federal health care programs (as defined in section 1320a-7b(f)(1) of this title) and to direct the appropriate State agency to exclude the person from participation in any State health care program.

121.   In short, an individual or entity, excluding a federal health care program beneficiary, is subject to the penalties and assessments of the CMPL and to exclusion from participation in any federal health care program when that individual or entity (1) knowingly presents or causes to be presented to the United States government a claim for an item or service and the person knows or should know the claim is false or fraudulent; (2) offers to or transfers remuneration to a federal health care program beneficiary that the offeror/transferor knows or should know is likely to influence the beneficiary to order or receive "from a ***particular*** provider, practitioner or supplier" [emphasis added] any item or service for which payment is made in whole or part under a federal or state health care program; or (3) commits a violation of the Anti-kickback Statute.  *See* 42 U.S.C. §§ 1320a-7a(a)(1)(B), (a)(5), (a)(7), and 1320a-7(b)(7).

122.   Defendant is also liable under the CMPL for actions of its agent-employees committed within the scope of the agency or employment.  *See* 42 U.S.C. § 1320a-7a(l).

123.   As required by law, Defendant expressly certified to the government that Defendant was in compliance with all federal health care law, which includes the Anti-Kickback Statute and CMPL, and relied upon that certification to obtain reimbursement from Medicare,

Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

124.    Defendant also implicitly certified to the government that Defendant was in compliance with all federal health care law, which includes the Anti-Kickback Statute and the CMPL, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

125.    Walgreens' certification of compliance with all federal health care law is evidenced by the "Walgreen Co. Pharmacy Code of Conduct," which states that

> Walgreens is committed to compliance with all federal and state health care statutes, rules, regulations and guidelines, including all requirements of Medicare, Medicaid and other government health care programs. Walgreens is committed to preparing and submitting accurate billings consistent with Medicare, Medicaid and other government sponsored health care program rules and regulations.

126.    Walgreens' certification of compliance with all federal health care law is evidenced by Defendant's published ethics with regard to anti-kickback laws, which states that

> It is the Company's policy to comply with all laws that regulate the obtaining of prescription or other healthcare business. Employees may not give or receive anything of value for their own benefit or for the benefit of the Company, including entertainment, or free or below cost services, in exchange for referring or receiving referrals of patients, goods or services.

127.    As set forth in the preceding paragraphs, including the General Allegations, *supra*, Defendant offered to pay and/or did pay remuneration, including discount checks, gift cards coupons, and coupon brochures, to induce beneficiaries of Medicare, Medicaid, and other federal and state health care programs to purchase or order prescriptions from Defendant.

128.    Defendant failed to reflect these discounts in the claims or charges for reimbursement that it made to Medicare, Medicaid, and other federal and state health care programs.

129.    Instead of passing on the above discounts to Medicare, Medicaid, and other federal and state health care programs, Defendant provided the remuneration directly to the federal and state health care program beneficiaries.

130.    Defendant also used the remuneration as incentive for the federal and state health care beneficiaries to obtain their prescriptions from Defendant in particular.

131.    Despite withholding the existence of the discounts from the federal and state health care programs, Defendant claimed reimbursement from Medicare, Medicaid, and other federal and state health care programs in the full amount of the good, service, or item provided while contemporaneously certifying, both explicitly and implicitly, that Defendant was in compliance with all federal and state health care laws, including the Anti-kickback Statute and the CMPL.

132.    Defendant performed the above illegal and improper acts and also directed its agents and employees to commit the same illegal and improper acts in the course of, and within the scope of, their employment.

133.    If the United States government had been aware of Defendant's improper and illegal conduct, including the false certifications, the government would not have made payment on or approved Defendant's claims for reimbursement under Medicare, Medicaid, and other federal or state health care programs.

134.   By agreement and by law, Defendant was required to comply with all Federal health care law, which includes the Anti-Kickback Statute, the CMPL, and the rules and regulations of Medicare, Medicaid, and the United States Department of Health and Human Services.  Defendant acted with actual knowledge, deliberate ignorance, and/or reckless disregard in submitting false or fraudulent claims to the government and in providing remuneration to influence federal or state health care beneficiaries to order or receive goods from a particular supplier.

135.   As a result of Defendant's false and fraudulent certifications and claims for reimbursement, Defendant has violated the False Claims Act, the Michigan Medicaid False Claims Act and caused the United States government to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of herself and of the United States and the State of Michigan, requests judgment as follows:

A.   The United States and the State of Michigan are entitled to reimbursement of the funds obtained by Defendant as a result of fraudulent claims submitted to the United States and the State of Michigan.

B.   The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation, for each false or fraudulent claim plus 3 times the damages sustained by the United States as a result of the false or fraudulent claim.  *See* 31 U.S.C. § 3729(a); 28 C.F.R. 85.3(a)(9).

C.   The United States is entitled to a civil monetary penalty of $10,000 to $50,000 for each violation of the CMPL or the Anti-kickback Statute, plus an assessment of not more than 3

times the amount of each false or fraudulent claim without regard to damages actually sustained by the United States.  *See* 42 U.S.C. § 1320a-7a(a).

D.      The United States is entitled to exclude Defendant from participation in any federal health care program.  *See* 42 U.S.C. § 1320a-7(b)(7).

E.      Relator, Cassie Bass, is entitled to an amount for reasonable expenses necessarily incurred, plus reasonable attorneys' fees and costs.  *See* 31 U.S.C. § 3730(d).

F.      Relator, Cassie Bass, is entitled to an order of partial distribution of the damages, penalties, assessments, and other relief awarded to the United States in an amount equivalent to a percentage of the entire recovery as set forth in 31 U.S.C. § 3730(d); such percentage distribution is in addition to Relator's recovery of expenses, attorneys' fees, and costs.

Respectfully submitted,

s/ Patricia A. Stamler
HERTZ SCHRAM PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com
P35905

Dated: September 5, 2008

## **DEMAND FOR TRIAL BY JURY**

NOW COMES Plaintiff/Relator, Cassie Bass, on behalf of herself and the United States of America and the State of Michigan, by and through her attorneys, HERTZ SCHRAM PC, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

s/ Patricia A. Stamler
HERTZ SCHRAM PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com
P35905

Dated: September 5, 2008
S:\Staff\Stamler, Patricia\Bass, Cassie 7629-1\Pleadings\Complaint.doc

37